UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>FRANCISCO LOPEZ | 1:19-cr-10459-RWZ |

### FRANCISCO LOPEZ'S SENTENCING MEMORANDUM

Mr. Lopez comes to this Court ready to lay the foundation for his restoration to society, working to become the father and community member his family needs. In consideration of that commitment, his personal characteristics, and the § 3553 sentencing factors, Mr. Lopez asks this Court to sentence him to the low-end of the range, 108 months of incarceration and 36 months of supervised release.

Mr. Lopez readily accepted responsibility for his conduct in this case. He now stands before the Court actively working to leave his old life, punctuated by the offense conduct, behind. As demonstrated by the thorough investigation in the PSR, Mr. Lopez is a devoted father. Despite the lack of a good example in his own father, and the tragic passing of his children's mother, Mr. Lopez works hard to maintain a relationship with his children and wants only to be a provider for them. Even while incarcerated and suffering long-term debilitating respiratory issues from COVID-19, he is dedicated to maintaining contact with his children and family. Each of the letters of support details his abiding loyalty to his family and his hard work and dedication as a provider.[1]

---

[1] *See* Exhibit 1, "Claudio Numerus Letter;" Exhibit 2, "Dawn Gallant Letter;" Exhibit 3, "Maria Ramos Letter;" Exhibit 4, "Iris Lopez Letter."

Mr. Lopez is already suffering the steep consequences of his mistakes: he has spent over 17 months[2] in pretrial custody, at least 12 of them on lockdown[3], on this offense and has sustained potentially permanent respiratory and neurological damage from contracting COVID-19[4] twice while in custody at Wyatt.[5] See PSR ¶¶ 139-140. Neither the criminal statutes nor the sentencing guidelines contemplate as a legitimate punishment the serious damage to his physical and mental health from the extended lockdowns and suffering months of debilitating COVID-19 symptoms (including now needing an inhaler). Even in face of incredible loss, Mr. Lopez has the courage to face a sentence more than triple the length of any he has faced before, so that he can come out on the other side ready to keep working hard to provide for his family. For these reasons, as discussed more fully below, Mr. Lopez respectfully requests that the Court impose a sentence not to exceed 108 months.

## Guideline Range Calculations

Reliably, the initial consideration at sentencing is the correct calculation of the guideline range under the Federal Sentencing Guidelines. Mr. Lopez disputes the drug

---

[2] He was arrested on December 5, 2019 (Docket #146, *see also* PSR, 2) and has been in custody since.

[3] *See* Frank Maradiaga, *Wyatt Detention Facility put on lockdown after inmate tests positive for COVID-19*, NBC 10 News (Apr. 21, 2020) https://turnto10.com/news/local/wyatt-detention-facility-put-on-lockdown-after-inmate-tests-positive-for-covid-19 (last accessed May 14, 2021)

[4] Kara Manke, *From lung scarring to heart damage, COVID-19 may leave lingering marks*, Berkeley News (July 8, 2020), https://news.berkeley.edu/2020/07/08/from-lung-scarring-to-heart-damage-covid-19-may-leave-lingering-marks/ (last accessed Sept. 8, 2020)

[5] Wyatt Detention Facility has repeatedly been the subject of protests and lawsuits for its poor conditions leading to serious injury or death, including its mishandling of COVID-19. *See* Sarah Ogundara, New legislation proposed to close private prisons in R.I., promote prison reform, The Brown Daily Herald (Mar. 30, 2021) https://www.browndailyherald.com/2021/03/30/new-legislation-proposed-close-private-prisons-r-promote-prison-reform/ (last accessed May 14, 2021) (describing a 2008 detainee death due to "vast medical negligence" and a May 2020 lawsuit requiring increased monitoring and provision of PPE to inmates).

weight calculation in the PSR as it is inconsistent with the plea agreement in this case: the PSR gives him a total offense level of 32 after adjustments, whereas the plea agreement reflects a total offense level of 29. Mr. Lopez agrees that a sentence of 9 years (108 months) comports with the agreed-upon range of 108 to 151 months.

## A Sufficient Sentence

The Sentencing Commission imbued Section 3553 with a parsimony principle, "instructing district courts to 'impose a sentence sufficient, but not greater than necessary,' to accomplish the goals of sentencing." *Kimbrough v. United States*, 552 U.S. 85, 101 (2007) (quoting 18 U.S.C. § 3553(a)). Although the statute requires the Court to consider guideline ranges in sentencing, it also "'permits the Court to tailor the sentence in light of other statutory concerns as well.'" *Id*. (quoting *United States v. Booker*, 543 U.S. 220, 245–46 (2005)).

The plea agreement in this case represents well-informed negotiations on both sides, considering Mr. Lopez's personal characteristics and remorseful posture, the difficulty of his pretrial detention, the relative seriousness of the offense, and public policy that favors rehabilitation over retribution where possible. Mr. Lopez seeks to elaborate on those concerns as they affect the Court's own calculations in setting the necessary sentence.

## The §3553(a) Factors

In imposing "a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, the Court must consider the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to

3

provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care or other correctional treatment in the most effective manner. *See* 18 U.S.C. §3553(a). The Court must also consider the nature and circumstances of the offense, the history and characteristics of the defendant, the kinds of sentences available, and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. *See* 18 U.S.C. § 3553(a); *Kimbrough*, 552 U.S. at 101.

**Mr. Lopez's personal characteristics demonstrate a man on the precipice of a redemption arc who could seriously benefit from the help of the BOP in preparing to reenter his community.**

When considering the history and characteristics of the defendant under 3553(a)(1), courts cite characteristics like age, low potential for recidivism, and commitment to personal growth as factors justifying a low sentence. *See United States v. Sloane*, 308 F.R.D. 85, 88 (E.D.N.Y. 2015). While Mr. Lopez has a family history of substance use disorder and economic struggle, he has always been dedicated to working to provide for his family. *See* PSR ¶¶122, 151-52.[6]  He's 43, with three beloved children whose mother passed the same year he was arrested in this case. He has family support, including emotional support for him during the turmoil of this case and support in taking care of his children.  As a middle-aged offender who will spend time in federal

---

[6] *See* Exhibits 1-4.

4

prison, his chances of recidivism on release are quite low.[7] On balance, his personal history and characteristics justify granting a lower sentence.

**Further consideration of the "tapestry of factors" named in 3553(a)(2) reveals that Mr. Lopez's sentence is best crafted with a rehabilitative rather than retributive tone.**

The austere pretrial detention he has suffered has been more punishing and scarring than any potential sentence contemplated within the criminal codes or the sentencing guidelines. First, Mr. Lopez acknowledges that the sentence he faces (9 years) is orders of magnitude larger than the longest sentence he has served previously (2.5 years in state court). *See* PSR ¶104. It is easy to imagine how the 17 months Mr. Lopez has spent mostly alone and in pain have felt much longer. The pandemic has been especially cruel to Mr. Lopez, as he is one of the 10% of people suffering with long term symptoms, and part of the less than one percent of people reinfected with COVID-19.[8] He has new physical health issues due to COVID-19, including a lasting loss of taste and smell, respiratory issues that require an inhaler, diabetes mellitus, and exacerbation of conditions like hypertension and hyperlipidemia. *See* PSR ¶139; *see also*

---

[7] Across all ages, federal prisoners had a much lower recidivism rate than state prisoners who also were released in the same year and tracked by the Bureau of Justice Statistics. Federal prisoners who are released between the ages of 50-59 recidivate at a rate of 26%. If Mr. Lopez is sentenced to 108 months, he will be in that age group when released. *See* United States Sentencing Commission, *The Effects of Aging on Recidivism Among Federal Offenders* (Dec. 2017) https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20171207_Recidivism-Age.pdf (last accessed May 14, 2021).

[8] *See IS COVID-19 A "MASS DISABLING EVENT"?*, UCLA Office of Information Technology Disabilities & Computing Program, https://dcp.ucla.edu/covid-19-mass-disabling-event (last accessed May 14, 2021) (10% of COVID-19 infections lead to "long COVID"), *see also* Shawn Radcliffe, *COVID-19 Pandemic: What We Know About Coronavirus Reinfections*, Healthline, (February 4, 2021) https://www.healthline.com/health-news/covid-19-pandemic-what-we-know-about-coronavirus-reinfections#Reinfections-occur,-but-most-people-are-protected (last accessed May 14, 2021) ("A study of more than 20,000 healthcare workers in the United Kingdom found that of the more than 6,600 people who had a previous SARS-CoV-2 infection, only 44 contracted it again — less than 1 percent.")

Exhibit 5 "Medical Records." The overwhelming stress of pandemic isolation in jail has also worn on him: he was in segregation for more than six weeks, received little to no medical care, and was in distress over his health. *See* PSR ¶140.

In late April, prison staff found Mr. Lopez in his cell with injuries they attribute to self-injury, though Mr. Lopez has no memory of how he sustained the injuries.[9] Research on past respiratory virus pandemics, and on COVID-19, shows a heavy prevalence of self-injurious behavior attendant to these pandemics from both psychological and physical causes. For example, after the Spanish Flu pandemic, suicides increased markedly.[10] A study conducted in the 1990s on this phenomenon found that the pandemic likely increased suicides.[11] Admissions to asylums increased during and immediately after the pandemic, "even in countries like Norway that weren't in the war but were hit by influenza."[12] Family members of those who survived severe cases of the flu described the survivors (who later attempted or completed suicide) as "irrational at times ever since" recovering from the flu, "suffering from melancholia" or "mentally unsettled," suffering a "nervous disorder" or delirium, or going "temporarily insane."[13]

Some research on the psychological impacts of COVID-19 has already been conducted, though more long-term research is ongoing. One author noted the following connection between COVID-19 and suicide or self-injury:

---

[9] *See* Exhibit 5, "Medical Records," 14.
[10] Knute Berger, *Seattle struggled with suicide in late stages of the 1918 flu*, Crosscut (May 7, 2020) https://crosscut.com/2020/05/seattle-struggled-suicide-late-stages-1918-flu (last accessed May 22, 2021).
[11] *Id,* (internal citations omitted).
[12] *Id.*
[13] *Id.*

> Persistent psychiatric symptoms among COVID-19 survivors such as depression, anxiety, post-traumatic symptoms and cognitive impairment may be related to psychological factors and neurobiological injury. COVID-19 related neurological symptoms including anosmia, ageusia, dizziness, headache and seizures may persist for a long time after the acute COVID-19 illness….There is a high probability that symptoms of psychiatric, neurological and physical illnesses, as well as inflammatory damage to the brain in individuals with post-COVID syndrome increase suicidal ideation and behavior in this patient population.[14]

One study found that social distancing measures can lead to inflammation which is linked to suicidal behavior.[15] Effects of COVID-19 on the central nervous system traverse the same "biological pathways implicated in suicidal behaviors."[16] Numerous studies reviewed by L. Sher concluded that patients, among whom 3% suffered from mental illness prior, reported depression at rates exceeding 30% years after their SARS-COV-1 diagnosis or months after their COVID-19 diagnosis.[17] Respiratory viral infections are associated with a risk for suicide, including in coronavirus strain HCov-NL63, and having blood antibodies for Influenza B is "significantly associated with history of suicide attempt."[18] "Neurocognitive deficits" persist for survivors of Acute Respiratory Distress Syndrome (ARDS) years later.[19] Depressive symptoms—common in patients with post-COVID syndrome—can be caused by the physical, rather than

---

[14] L. Sher, *Post-COVID syndrome and suicide risk*, Oxford University Press (Apr. 27, 2021), https://pubmed.ncbi.nlm.nih.gov/33486531/ (last accessed May 22, 2021).

[15] I. Conejero, B. Nobile, E. Olié, Ph. Quartet, *How Does COVID-19 Affect the Neurobiology of Suicide?*, Current Psychiatry Reports (Mar. 3, 2021). https://pubmed.ncbi.nlm.nih.gov/33660116/ (last accessed May 22, 2021).

[16] I. Conejero, *supra*.

[17] L. Sher, *supra*.

[18] I. Conejero, *supra*.

[19] L. Sher, *supra*.

7

psychological, impacts of COVID-19 on the brain.[20] Depressive symptoms are also directly and strongly linked to suicidal behavior: "individuals suffering from depression are at 25 times greater risk for suicide than the general population. Physical illnesses including neurological conditions are also associated with non-lethal suicide attempts and suicide death."[21] Another study found that 13% of COVID-19 sufferers received their first diagnosis of a psychiatric condition 6 months after their COVID-19 diagnosis.[22] The more severe a person's COVID-19 experience, the greater their risk of mental health and neurological diagnoses.[23]

      Like Odysseus, Mr. Lopez has been on a hellacious journey, tossed roughly about on the seas of contracting COVID-19 twice while in BOP custody. After months in lockdown, he contracted COVID-19 and spent 6 weeks in isolation where his medical care was "shameful." *See* PSR ¶140. As distressing as working from home and social distancing has been for those of us outside of a detention facility, being locked inside a jail cell for 23 hours a day while losing visitation privileges and all extra-curricular and self-improvement activities has taken a much harder toll on incarcerated people. Undoubtedly, the higher isolation and stress of pandemic life inside a jail has an even

---

[20] L. Sher, *supra*. ("Major depression is one of the most frequent neuropsychiatric disorders related to inflammatory damage to the brain. Considerable evidence has linked depressive symptoms to pro-inflammatory factors and neuroglial failure.").
[21] *Id.*
[22] James Kingsland, *COVID-19: 1 in 3 diagnosed with brain or mental health condition*, Medical News Today (Apr. 9, 2021), https://www.medicalnewstoday.com/articles/covid-19-1-in-3-diagnosed-with-brain-or-mental-health-condition (last accessed May 22, 2021).
[23] *Id.*

greater inflammatory effect. Mr. Lopez still suffers from significant respiratory and neurological symptoms of his first COVID-19 diagnosis: he needs an inhaler to breathe, and he still has no sense of taste or smell. A 43-year-old man, he has never reported mental health issues until *after* he was diagnosed with COVID-19 while incarcerated.[24] Based on all the available research, his new mental health issues can be directly tied to contracting COVID-19. While Mr. Lopez is not blameless, the prescribed punishment for racketeering is not debilitating long-term physical and psychiatric ailments.

Mr. Lopez, taking agency over his rehabilitation, now wishes to seek mental health treatment to appropriately cope with this disaster. See PSR ¶143; *See also United States v. Estrada*, No. 19-CR-5058-BAS, 2021 WL 1626309, at *1 (S.D. Cal. Apr. 27, 2021) (recognizing that the judge discounted the defendant's sentence due to the particularly harsh conditions of confinement because of COVID-19); *see also United States v. Rodriguez*, 492 F. Supp. 3d 306, 311 (S.D.N.Y. 2020) (modifying a sentence based on the nature of prison in a pandemic, "harsher and more punitive than would otherwise have been the case," and the "onerous lockdowns and restrictions that have made the incarceration of prisoners far harsher than normal"). Long-term physical disability due to a traumatic event is certainly not a "just" punishment for the offense, but the Court may consider the particularly severe conditions under which Mr. Lopez has anxiously awaited the resolution of his case. A sentence on the lower-end of the range will still maintain the serious tenor that his pretrial detainment has taken on and will be three

---

[24] *See* Exhibit 5 "Medical Records," 1, 19 ("Adjustment disorder with depression")

9

times as punishing as the longest sentence he has yet served. Thus, a lower sentence is justified under 3553(a)(2)(A).

### Mr. Lopez's past criminal history and personal characteristics bear on the deterrence and protection factors as well.

Courts have used statistics regarding recidivism rates for individuals with the same characteristics as the defendant to justify under § 3553(a)(2)(B) the satisfactory deterrent effect of a shorter sentence. *See United States v. Watt*, 707 F. Supp. 2d 149, 158 (D. Mass. 2010). A defendant's stated commitment to rehabilitation is an appropriate consideration under § 3553(a)(2)(C), and a studied belief in that statement can justify a lower sentence based on a defendant's projected lack of danger to the community. *See United States v. Martin*, 520 F.3d 87, 93–94 (1st Cir. 2008) ("A founded prospect of meaningful rehabilitation remains a permissible basis for a variant sentence under the now-advisory guidelines.").

A sentence of 108 months is appropriately parsimonious in line with § 3553(a). The length of a lower-end sentence of 108 months compared to the longest sentence he has previously served (30 months) represents an appropriate increase in punishment to promote deterrence. Mr. Lopez's age at release also renders him unlikely on a statistical level to recidivate; especially when combined with his focus on maintaining gainful employment to provide a stable life for his children, Mr. Lopez does not need the negative incentive of over a decade in prison to appreciate the wrongfulness and import of his conduct. Studies show both that harsh sentencing does not work, especially in drug cases, and victims overall do not desire harsh sentencing. For example, research on legislation around the crack cocaine epidemic, both on the Anti-Drug Abuse Act of

1986 and the Fair Sentencing Act of 2010, demonstrates that heavy-handed sentencing schemes do not reduce harm based on use or sales and have an inverse relationship to the goals of sentencing.[25] Empirically speaking, it cannot be overstated that harsh drug sentencing regimes do not work, from a deterrence perspective or a harm-reduction perspective.[26] Further, there is evidence demonstrating that prison may heighten the risk of recidivism. *See e.g.*, The Sentencing Project, *Incarceration and Crime: A Complex Relationship*, 7 (2005) ("The rapid growth of incarceration has had profoundly disruptive effects that radiate into other spheres of society. The persistent removal of persons from the community to prison and their eventual return has a destabilizing effect that has been demonstrated to fray family and community bonds and contribute to an increase in recidivism and future criminality.") (footnote and citation omitted). *See also generally* Justice Strategies, *Children on the Outside: Voicing the Pain and Human Costs of Parental Incarceration* (2011) (discussing effects of parental incarceration on children's emotional and economic well-being).[27]

---

[25] *See*, e.g., Lauryn Saxe Walker & Briana Mezuk, *Panel Paper: Mandatory Minimum Sentences: The Impact on Crack and Powder Cocaine Use*, APPAM DC Regional Student Conference (2017), https://appam.confex.com/appam/sc17dc/webprogram/Paper19844.html (assessing the impact of the Anti-Drug Abuse Act of 1986 and the Fair Sentencing Act of 2010 on crack-cocaine use and finding no differential impact) (Panel Paper: Mandatory Minimum Sentences). *See also* USSC, Report to the Congress: Impact of the Fair Sentencing Act of 2010, 11-12, 27 (2015) (finding that half as many individuals were sentenced in 2014 in the federal system as had been in 2010; that crack-cocaine represented the most commonly-sentenced drug in only 9 federal districts in 2014, down from 36 districts in 2010; and that passage of the Act did not disrupt the ongoing decline of crack-cocaine users according to survey data). *See also* Panel Paper: Mandatory Minimum Sentences.

[26] *See also More Imprisonment Does Not Reduce State Drug Problems: Data show no relationship between prison terms and drug misuse*, Pew (Mar. 8, 2018) pewtrusts.org/en/research-and-analysis/issue-briefs/2018/03/more-imprisonment-does-not-reduce-state-drug-problems ("The absence of any relationship between states' rates of drug imprisonment and drug problems suggests that expanding drug imprisonment is not likely to be an effective national drug control and prevention strategy.") (last accessed May 14, 2021)

[27] Available at http://www.justicestrategies.org/sites/default/files/publications/JS-COIP-1-13-11.pdf (last visited May 14, 2021).

Mr. Lopez's health conditions (which require an inhaler to manage), his age on release, and his past employment all depict a man who poses little danger to the community. His former employer described him as a person with a passion for safety, who took good care of the vulnerable people where he worked to ensure no harm came to them.[28] Moreover, victims of crime agree that lengthy prison sentences do not keep communities safe; victims who suffer harm at the hands of defendants want rehabilitation, not retribution, to ameliorate that harm. The National Survey on Victims' Views discovered that "the overwhelming majority of crime victims believe that the criminal justice system relies too heavily on incarceration, and strongly prefer investments in prevention and treatment to more spending on prisons and jails."[29]  6 in 10 victims prefer shorter prison sentences, about 75% of victims prefer holding people accountable through "options beyond prison, such as rehabilitation," treatment, or community-based options. Sentencing that addresses the societal causes of recidivism (lack of education or vocational training, unmet medical needs, or other treatment needs) honors victims much more than warehousing defendants for decades in cages. Empirical data and common-sense inferences specific to Mr. Lopez both counsel in favor of a lower sentence to promote deterrence and protective goals under 3553(a)(2)(B) and (C).

**Widespread victim support for rehabilitation, backed by empirical data showing that educational and vocational programming reduces recidivism, entreats a lower sentence under § 3553(a)(2)(D).**

---

[28] *See* Exhibit 1, Claudius Numerus Letter.

[29] *See* Alliance for Safety and Justice, *Crime Survivors Speak: The First Ever National Survey of Victims' Views on Safety and Justice*, (August 3, 2016) http://allianceforsafetyandjustice.org/wp-content/uploads/documents/Crime%20Survivors%20Speak%20Report.pdf (last accessed May 14, 2021).

The Court should fashion a sentence that effectively meets the defendant's needs for educational or vocational training. 18 U.S.C.A. § 3553(a)(2)(D). Mr. Lopez has demonstrated that he can hold a job despite his lack of qualifications. *See* PSR ¶¶149, 151-52. But at 43, he is at a disadvantage compared to his peers because he dropped out of school in the 10th grade.[30] Mr. Lopez and the community would both benefit from a sentence that provides him with education and vocational training: education in prison can reduce recidivism by a further 29%.[31] The benefits of training and educating Mr. Lopez will also inure to his children: one study found that

> children of [parents] enrolled in the prison college program expressed pride in their [parents'] academic achievements, were inspired to take their own education more seriously and were more motivated to attend college themselves.[32]

The BOP is quite opaque about what options are available at any given time, and they vary between facilities.[33] It is certain that Mr. Lopez will spend a minimum of 240 hours studying for his GED. If he wishes to pursue "traditional college courses," often available only via mail correspondence, he will be required to self-fund that study. A sentence of 9 years provides more than enough time for Mr. Lopez to avail himself of

---

[30] 77.6% of Americans born between 1976-1980 completed high school, and 59.3% of Hispanic men in that same cohort completed high school. *See* Richard J. Mernane, *U.S HIGH SCHOOL GRADUATION RATES: PATTERNS AND EXPLANATIONS*, Nat'l Bureau of Econ. Research, (2013) https://www.nber.org/system/files/working_papers/w18701/w18701.pdf (last accessed May 14, 2021)

[31] *See* Prison Studies Project, *Why Prison Education?*, https://prisonstudiesproject.org/why-prison-education-programs/ (last accessed May 14, 2021) (*citing* Stephen Steurer, Linda Smith, and Alice Tracy, *Three State Recidivism Study*, Correctional Education Association (2001))

[32] *See* Prison Studies Project, Why Prison Education?, https://prisonstudiesproject.org/why-prison-education-programs/ (last accessed May 14, 2021) (*citing* Wendy Erisman and Jeanne Bayer Contardo, *Learning to Reduce Recidivism: A 50-State Analysis of Postsecondary Correctional Education Policy*, Institute for Higher Education Policy (2005))

[33] *See* https://www.bop.gov/inmates/custody_and_care/education.jsp (last accessed May 14, 2021)

the educational and vocational training opportunities the BOP may provide. Therefore, a sentence at the lower end of the range comports with § 3553(a)(2)(D).

**A lower-end sentence honors the public policy of promoting family unity.**

Where there is an appropriate public policy to consider, it must factor into the sentence set by the Court. 18 U.S.C.A. § 3553(5). The Sentencing Commission has stated a preference for a lower sentence or a sentence that promotes family unity where there is a special need for a defendant as a primary caretaker to support his family. USSG § 5H1.6. Mr. Lopez has three children whose mother recently passed away. [cite to PSR]. One of his daughters, Janessi, suffers from a brain disease that requires ongoing medical attention. PSR ¶134. Even at the bottom of the range contemplated by the plea agreement, by the time Mr. Lopez is released from prison, Janessi will be a young adult. A sentence at the low-end of the range will allow the Lopez family to reunite as soon as possible so that Mr. Lopez can help guide his children as they enter their teen and young adult years, and he can help Janessi navigate the medical system. She will need someone familiar with her medical condition and special requirements to help her learn how to advocate for herself.

If the Court sentences him to 108 months, Mr. Lopez will return home at a time when his son, a preteen, will be vulnerable to the pressure of the young men around him and in need of a father to keep him off the street and in school. If Mr. Lopez is to have a chance to break the cycle that his parents started once and for all – parenting at a young age, dropping out of school, substance use, criminal convictions – he will need to be home with his children. With the sooner return that a shorter sentence will bring, Mr.

Doe may also be able to ameliorate some of the vicious effects that a father's absence can wreak:

> Children of incarcerated parents, whether it is their mother or father who is imprisoned, will likely experience emotional, physical, mental and behavioral problems. In one study, the sons of incarcerated fathers exhibited aggressive, delinquent and criminal behavior shortly after their father's incarceration. In addition to behavioral problems, many of these children's school performance declined rapidly upon incarceration of their fathers. . . . research shows that the children of an incarcerated father are at risk of continuing the cycle of criminality.

Tiffany J. Jones, *Neglected By The System: A Call For Equal Treatment For Incarcerated Fathers And Their Children – Will Father Absenteeism Perpetuate The Cycle Of Criminality?*, 39 Cal. W. L. Rev. 87, 99 (Fall 2002).

Correspondingly, a below-range sentence leaves open the possibility that his children, while still at an impressionable age, will see their father free and striving to build a better life and to prove that rehabilitation and redemption are possible. A higher sentence, on the other hand, would mean that his son would be old enough to drop out of high school before he sees his father free again. The effect of their father's incarceration during the rest of their childhood, while profoundly visited upon Janelli, Janessi, and Francisco Jr., will unfortunately not be limited to them:

> society ultimately bears the burden of familial incarceration because inmates separated from their families have a higher rate of recidivism, their children have a greater likelihood of becoming criminals themselves, and families often become increasingly unstable. Many of these children experience behavioral and educational problems and do not receive the attention they need to discourage them from committing delinquent acts. Society then falls victim to these children's crimes and bears the financial and social costs of supporting them.[34]

---

[34] Tiffany J. Jones, *Neglected By The System: A Call For Equal Treatment For Incarcerated Fathers And Their Children – Will Father Absenteeism Perpetuate The Cycle Of Criminality?*, 39 Cal. W. L. Rev. 87, 99 (Fall 2002) (internal citations and quotations omitted).

15

Thus, a lower sentence for Mr. Lopez is urged under §3553(5) because it promotes family unity in line with stated public policy goals.  It is also appropriate from a societal standpoint and from the perspective of minimizing the detriment to his children and breaking the cycle of crime and negativity that plague his family.

### Any disparity potentially created by a low sentence for Mr. Lopez is warranted by his personal characteristics and obliges necessary sentencing considerations.

The Court must also consider the need to avoid unwarranted disparities among similar offenders. 18 U.S.C. § 3553(a)(6). However, this preference is not to avoid all disparities at all costs. Rather, it is to avoid unwarranted disparities; disparity remains an ameliorative tool to adjust the guidelines because "[f]air sentencing is individualized sentencing." *Fifteen Years of Guidelines Sentencing* at 113 (Nov. 2004).[35] Congressionally designed harsh sentencing regimes have only resulted in dramatic over-incarceration of Hispanic people and draconian punishments for drug crimes. As noted above, empirical research has shown over and over that long prison sentences only create unwarranted disparity and do not serve the stated goal of crime reduction.

Mr. Lopez is Hispanic: Hispanic people are incarcerated in the federal system at 5 times the rate of white people. This is true because Hispanic people are proportionally overrepresented in federal prisons, making up only 18% of the US population but over 30% of the federal prison population, and white people are underrepresented, making

---

[35] U.S. Sentencing Commission, *Fifteen Years of Sentencing*, (Nov., 2004) https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-projects-and-surveys/miscellaneous/15-year-study/15_year_study_full.pdf (last accessed May 14, 2021).

up 76% of the US population but only 28% of the federal prison population.[36] The Court should take special care to consider the over-incarceration of Hispanic people when it sentences Mr. Lopez within the range of the plea agreement.

A sentence of 108 months—the lower-end of the agreed range—will fit the pattern of this district and of the First Circuit by varying below the harsh scheme of the guidelines. On a national level, the majority of sentences are within the guideline range.[37] In the First Circuit, the majority of sentences are outside of (and below) the guideline range, and courts in this circuit depart downward over five times as often as they depart upward.[38] In the District of Massachusetts, 63% of sentences are outside the guideline range, and courts depart downward over three times as often as they depart upward.[39] Thus, the established local trend is to account for individual characteristics and depart down from the guidelines to fashion a more appropriate sentence.

Offense specific trends reflect the notion that less time is more appropriate. At the national level, the average sentence for a racketeering offense is 32 months, with a median of 27 months.[40] The First Circuit trends lower at an average sentence of 24 months and a median of 21 months.[41] Since the underlying conduct in this case involves

---

[36] *See* United States Sentencing Bureau, *Quick Facts: United States*, https://www.census.gov/quickfacts/fact/table/US/PST045219 (last accessed May 14, 2021); *see also* Mark Motivans, *Federal Justice Statistics: 2017-2018*, Bureau of Justice Statistics, 15 (Apr. 2021), https://www.bjs.gov/content/pub/pdf/fjs1718.pdf (last accessed May 14, 2021).

[37] *See* United States Sentencing Commission, *Statistical Information Packet, Fiscal Year 2019: First Circuit*, 12-13 https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2019/1c19.pdf (last accessed May 14, 2021).

[38] *Id.* at 13.

[39] *Id.*

[40] *Id.* at 11.

[41] *Id.*

drugs, trends for drug trafficking are also relevant: the national average sentence for drug trafficking is 76 months, while the First Circuit average is 63 months.[42] The median drug sentence nationally and in this circuit is 60 months.[43] 108 months exceeds all of these sentences by multiple years, demonstrating the seriousness of the offense relative to the range of similar conduct.

A sentence of 108 months will also reflect leadership-level culpability within the case by exceeding both the case average and case median by a large margin.



"Case Average" is the average of all sentences set in this case as described by the PSR, and the "Case Median" uses that same data set. Where a defendant was sentenced to "time served," that was calculated as 0. For Michael Marrero, defendant #5, and Gregory Peguero-Colon, defendant #6, the chart reflects the midpoint of the range stated in their respective C-Pleas. This chart depicts results for defendants #3 through

---

[42] *Id.*
[43] *Id.*

#7 as an approximation of similar culpability. Even if Marrero and Peguero-Colon are sentenced at the top end of their C-Plea ranges, a sentence at the bottom of Mr. Lopez's range will still exceed Marrero and Peguero-Colon's sentences by a few years. Therefore, a sentence at the bottom of the range in Mr. Lopez's plea agreement will not create unwarranted disparity in compliance with §3553(a)(6).

## Conclusion

Mr. Lopez is a humble, hard-working, family man who wants the chance to finally overcome the toxic cycles he has been stuck in for years. Growing up poor and essentially fatherless did not set him up for success, and the criminal justice system has so far saddled him with more trauma and has failed to prepare him for a life outside of prison. While he did not make an excellent choice in this case, his intentions were to work hard to provide for his family the only way he could in his circumstances at the time. To this day, he remains dedicated to that goal and hopeful that this Court will give him the chance to show he has changed. At this crucial moment, where he has suffered a grueling year marred by two viral infections that have left him with long-term health problems, he must marshal all his resilience to raise three children without their mother. The sentence imposed by the Court has the potential to rehabilitate him, provide him with opportunities for education and vocational training, or it has the potential to cement him and his family into the toxic cycle of recidivism and poverty. This moment in his life is a pivotal moment in Mr. Lopez's redemption story, and the Court can grant him the opportunity to live that story by sentencing him to 108 months.

                                                        Respectfully Submitted,
                                                        FRANCISCO LOPEZ
                                                        By and through counsel

Date: June 2, 2021                            */s/ Leonard E. Milligan III*
                                                        Leonard E. Milligan III
                                                        BBO #668836
                                                        MILLIGAN RONA DURAN & KING LLC
                                                        50 CONGRESS STREET, SUITE 600
                                                        BOSTON, MA 02109
                                                         t. 617.395.9493
                                                         lem@mrdklaw.com

## CERTIFICATE OF SERVICE

     I, Leonard E. Milligan III, hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants on this date.


Date: June 2, 2021                                      /s/Leonard E. Milligan III
                                                              Leonard E. Milligan III